No. 09-50822

# In the United States Court of Appeals for the Fifth Circuit

_____

ABIGAIL FISHER,

*Plaintiff - Appellant*,

v.

UNIVERSITY OF TEXAS AT AUSTIN, ET AL.,

*Defendants - Appellees*.

_____

On Appeal from the United States District Court
Western District of Texas, Austin Division

_____

## SUPPLEMENTAL BRIEF FOR APPELLEES

_____

Patricia C. Ohlendorf
Vice President for Legal Affairs
THE UNIVERSITY OF
    TEXAS AT AUSTIN
Flawn Academic Center
2304 Whitis Avenue
Stop G4800
Austin, TX 78712

Gregory G. Garre*
    *Counsel of Record*
Maureen E. Mahoney
Lori Alvino McGill
LATHAM & WATKINS LLP
555 11th Street, NW, Suite 1000
Washington, DC 20004
gregory.garre@lw.com
Tel:  202-637-2207
Fax: 202-637-2201

Douglas Laycock
UNIVERSITY OF VIRGINIA
    SCHOOL OF LAW
580 Massie Road
Charlottesville, VA 22903

James C. Ho
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue
Suite 1110
Dallas, TX 75201-6912

## CERTIFICATE OF INTERESTED PARTIES

Appellees adopt Appellant's certificate of interested parties.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PARTIES .........................................................i

TABLE OF AUTHORITIES .................................................................................iv

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT .........................................................................................................6

I.    FISHER LACKS STANDING TO PURSUE HER SOLE REMAINING CLAIM FOR RELIEF .......................................................6

    A.    Fisher Lacks Standing Because She Has Suffered No Cognizable Injury Supporting Her Backward-Looking Claim For Relief.......................................................................................7

    B.    The Record Conclusively Establishes That Fisher Would Not Have Been Admitted No Matter Her Race .........................................10

    C.    The Particular Damages That Fisher Has Sought Would Not Redress The Injury She Alleges ...........................................................14

    D.    Fisher Has Provided No Reason To Ignore These Patent Defects .....................................................................................................15

II.    UT HAS ESTABLISHED THAT ITS ADMISSIONS PLAN IS NARROWLY TAILORED TO ITS EDUCATIONAL OBJECTIVES .......20

    A.    The Supreme Court Accepted Existing Law "As Given" In Fisher And Remanded For Consideration Of Narrow Tailoring ........21

    B.    The Record Establishes That UT's Admissions Policy Is Narrowly Tailored To Obtain The Educational Benefits Of Diversity ............................................................................................26

        1.    UT's Policy Meets Or Exceeds The Benchmarks The Supreme Court Has Set For The Implementation Of A Constitutional Race-Conscious Admissions Policy..................27

        2.    The Record Establishes That There Are No Workable Race-Neutral Alternatives To UT's Policy................................28

        3.    UT's Holistic Admissions Plan Directly And Meaningfully Advances UT's Interest.......................................35

        4.    Petitioner's Remaining Narrow Tailoring Arguments Fail ......39

**Page**

      C.      Fisher's Challenge To UT's Determination That It Lacked A "Critical Mass" In 2004 Or 2008 Is Outside The Scope Of The Supreme Court's Remand And, In Any Event, Lacks Merit ..............43

III.    THIS COURT HAS DISCRETION TO REMAND THE CASE TO THE DISTRICT COURT IF IT CHOOSES TO DO SO.............................50

CONCLUSION .......................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adarand Contractors, Inc. v. Pena*,
   515 U.S. 200 (1995)............................................................................10

*Aiken v. Hackett*,
   281 F.3d 516 (6th Cir. 2002) ...................................................9

*Alvarez v. Smith*,
   130 S. Ct. 576 (2009)............................................................15

*Arizonans for Official English v. Arizona*,
   520 U.S. 43 (1997)................................................................14

*Braunstein v. Arizona Department of Transportation*,
   683 F.3d 1177 (9th Cir. 2012) ..............................................9

*Camreta v. Greene*,
   131 S. Ct. 2020 (2011)....................................................18, 19

*Christianson v. Colt Industries Operating Corp.*,
   486 U.S. 800 (1988)..............................................................18

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989)..............................................................34

*Clayton v. ConocoPhillips Co.*,
   722 F.3d 279 (5th Cir. 2013) ................................................17

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*,
   188 F.3d 278 (5th Cir. 1999) ................................................52

*DeFunis v. Odegaard*,
   416 U.S. 312 (1974)...........................................................7, 17

**Page(s)**

*Donahue v. City of Boston*,
   371 F.3d 7 (1st Cir. 2004).....................................................................9

*Elk Grove Unified School District v. Newdow*,
   124 S. Ct. 2301 (2004).......................................................................18

*Fisher v. University of Texas*,
   133 S. Ct. 2411 (2013)...............................................................*passim*

*Fisher v. University of Texas*,
   631 F.3d 213 (5th Cir. 2011).....................................................*passim*

*Fisher v. University of Texas*,
   645 F. Supp. 2d 587 (W.D. Tex. 2009) ........................3, 28, 29, 36, 46

*Fox v. Board of Trustees of the State University of New York*,
   42 F.3d 135 (2d Cir. 1994)..................................................................15

*FW/PBS, Inc. v. City of Dallas*,
   896 F.2d 864 (5th Cir. 1990)..............................................................50

*Grutter v. Bollinger*,
   539 U.S. 306 (2003)....................................................................*passim*

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*,
   634 F.3d 787 (5th Cir. 2011)................................................................7

*League of United Latin American Citizens v. Perry*,
   548 U.S. 399 (2006)............................................................................47

*Monteiro v. City of Elizabeth*,
   436 F.3d 397 (3d Cir. 2006)..................................................................9

*Northeastern Florida Chapter of the Associated General Contractors v. City
   of Jacksonville*,
   508 U.S. 656 (1993)..............................................................................9

**Page(s)**

*Parents Involved in Community Schools v. Seattle School District Number 1*,
    551 U.S. 701 (2007).............................................................36, 44, 47

*PDK Laboratories, Inc. v. United States Drug Enforcement Administration*,
    362 F.3d 786 (D.C. Cir. 2004)..........................................................18

*Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*,
    123 F.3d 111 (3d Cir. 1997) ............................................................18

*Regents of the University of California v. Bakke*,
    438 U.S. 265 (1978).................................................................*passim*

*Schlueter v. Latek*,
    683 F.3d 350 (7th Cir. 2012) ...........................................................15

*Spector v. Norwegian Cruise Line, Ltd.*,
    427 F.3d 285 (5th Cir. 2005) ...........................................................50

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998)..................................................................14, 16

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009)...................................................................13

*Sweet v. Childs*,
    507 F.2d 675 (5th Cir. 1975) ..........................................................12

*Texas v. Lesage*,
    528 U.S. 18 (1999)...............................................................5, 6, 8, 9

*Thomas R.W. ex rel. Pamela R. v. Massachusetts Department of Education*,
    130 F.3d 477 (1st Cir. 1997)...........................................................15

*United States v. Williamson*,
    47 F.3d 1090 (11th Cir. 1995) .........................................................51

**Page(s)**

*University of Texas v. Camenisch*,
  451 U.S. 390 (1981).........................................................................13

*Weser v. Glen*,
  190 F. Supp. 2d 384 (E.D.N.Y.), *aff'd*, 41 F. App'x 521 (2d Cir. 2002).............9

*Wooden v. Board of Regents of the University System of Georgia*,
  247 F.3d 1262 (11th Cir. 2001) ..........................................................9

*Wygant v. Jackson Board of Education*,
  476 U.S. 267 (1986).....................................................................24, 34

## OTHER AUTHORITIES

Elise Boddie, *Commentary on* Fisher:  *The importance of diversity within diversity*, SCOTUSBlog (Oct. 11, 2012),
  http://www.scotusblog.com/2012/10/commentary-on-fisher-the-importance-of-diversity-within-diversity/ ........................................................48

William G. Bowen & Derek Bok, *The Shape of the River* (1998) ..........................30

Jess Bravin, *Justices Face A Test On Race:  A University Of Texas Admissions Policy Aims To Help High-Scoring Minorities*, Wall St. J, Oct. 8, 2012, *available at* http://online.wsj.com/news/articles/ SB10000872396390443294904578044561424368452 .....................................34

Adam D. Chandler, *How (Not) To Bring an Affirmative-Action Challenge*, 122 Yale L.J. Online 85 (2012) ...................................................9, 19

Catherine L. Horn & Stella M. Flores, *Percent Plans in College Admission: A Comparative Analysis of Three States' Experiences* (2003)..........................33

## INTRODUCTION AND SUMMARY OF ARGUMENT

In its initial decision, this Court examined in detail Fisher's many challenges to the University of Texas at Austin (UT)'s race-conscious admissions plan and concluded that the plan was constitutional under *Grutter v. Bollinger*, 539 U.S. 306 (2003). *See Fisher v. University of Texas*, 631 F.3d 213 (5th Cir. 2011); *id.* at 247 (Garza, J., concurring). The Court likewise rejected Fisher's indirect challenges to *Grutter* itself—such as her claim that the "strong basis in evidence" standard applies in this context. *Id.* at 232-34. In the Supreme Court, Fisher strenuously challenged virtually all aspects of this Court's decision and ultimately urged the Court to overrule *Grutter.* Fisher S. Ct. Br. 53-57. In response, the Supreme Court issued a 7-1 decision that accepted "as given" the Court's existing precedent— including *Grutter* and *Regents of the University of California v. Bakke*, 438 U.S. 265, 305 (1978) (op. of Powell, J.)—and that declined to find that any aspect of the UT plan was invalid. *See Fisher v. University of Texas,* 133 S. Ct. 2411, 2417 (2013). Instead, the Court held that this Court had erred in applying *Grutter* by according deference to UT in the narrow-tailoring inquiry. *Id.* at 2421.

The Supreme Court remanded the case for reconsideration of the narrow-tailoring inquiry—without deference to UT on that inquiry. Specifically, the Court asked this Court to "assess whether the University has offered sufficient evidence that would prove that its admissions program is narrowly tailored to obtain the

educational benefits of diversity." *Id*. As explained below, that inquiry—though unquestionably searching—simply does not alter the conclusion that this Court previously reached: UT's limited and highly individualized consideration of race in its holistic admissions process is narrowly tailored to its indisputably compelling interest in seeking for *all* of its students—the future leaders of Texas—the educational benefits of student body diversity.

In her supplemental brief, Fisher ignores that the remand is tied to the narrow-tailoring prong and leads her merits discussion by rearguing that UT lacked a "critical mass" when it decided to *adopt* the plan to begin with. Fisher Supp. Br. 22-33. But as Fisher herself recognized in the prior appeal, that critical-mass determination concerns whether UT had a compelling interest at all in seeking a diverse student body. *See, e.g.*, Fisher Opening Br. 38-47; Fisher Reply Br. 4-5. The narrow tailoring analysis, by contrast, looks to whether—assuming a university has established a compelling interest in doing *something* to foster (or maintain) student body diversity—the race-conscious plan at issue meets strict scrutiny "in its *implementation*." *Fisher*, 133 S. Ct. at 2419-20 (emphasis added). That is, the analysis looks to whether "the *means*" used by the university are constitutional. *Id.* at 2420 (emphasis added). Fisher's argument that UT already had a critical mass when it adopted its plan lacks merit (as this Court previously held). Among other things, Fisher's argument rests on the discredited premises

that all underrepresented minority students are fungible and that a University's compelling interest in student body diversity vanishes once aggregate "minority" enrollment reaches a specific percentage. But the more salient point now is that this argument does not concern whether the plan is *narrowly tailored*.

As for narrow tailoring, perhaps the most striking aspect of Fisher's supplemental brief is that she does not seriously dispute that UT's consideration of race is highly individualized and modest—the focus of the narrow-tailoring objections in *Grutter*. Instead, she argues that UT overlooked "workable race-neutral alternatives" to considering race in its holistic plan. But that argument—as the District Court found—"ignore[s] the facts of this case." *Fisher v. University of Texas*, 645 F. Supp. 2d 587, 610 (W.D. Tex. 2009). For seven years, UT tried all the key race-neutral tools touted by Fisher before it finally added race to its holistic admissions plan in 2004. Yet by 2003, African-American enrollment had dropped in half, the levels of underrepresented minorities had remained stagnant or worse, and the odds of admission for underrepresented minorities in the second decile of their high school class declined. In short, the numerous race-neutral tools that it tried were not working to achieve its compelling interest.

Really, Fisher is just asking this Court, again, to hold that the adoption of a percentage plan is an all-or-nothing proposition under narrow tailoring. But *Grutter* forecloses the argument that the Top 10% law is a "workable" alternative,

3

as does the record in this case.  And Fisher's paradoxical argument that the presence of the percentage plan made the impact of UT's holistic plan too *minimal* to be constitutional also fails.  As this Court previously recognized, the Supreme Court has never suggested that a *Grutter* plan cannot be deployed in conjunction with race-neutral alternatives.  631 F.3d at 246.  In any event, the record shows that UT's holistic plan, though appropriately modest in its consideration of race, has a meaningful impact on UT's goal of attaining the educational benefits of diversity.

Reconsidering the narrow-tailoring inquiry in light of the Supreme Court's decision—and devoid of any deference—should not alter the result that this Court previously reached.  Fisher does not seriously question the key factual premises underlying this Court's prior decision.  Instead, she challenges the *legal* consequences of those facts.  In doing so, her supplemental brief exudes a view of constitutional law that, in effect, would prohibit the consideration of race in all circumstances, except, in theory, to remedy past discrimination.  The Supreme Court, however, rejected that view in *Bakke*.  It rejected it again in *Grutter*.  And it rejected it again in the case that now bears her name.  Of course, not all race-conscious plans will survive strict scrutiny.  *See Gratz v. Bollinger,* 539 U.S. 244 (2003).  But UT's plan is if anything only *more* modest and *more* nuanced than the race-conscious plans approved in *Bakke* and *Grutter*, a point that is underscored by

the fact that Fisher does not seriously challenge the limited manner in which UT considers race, except to complain—ironically—that it is *too* limited.

There is, however, a threshold basis for disposing of this case:  Fisher—the sole remaining plaintiff—has failed to show that she has suffered any cognizable or redressable injury as a result of UT's consideration of race.  Because she did not sue on behalf of a class, Fisher's graduation from a different college in May 2012 irrevocably mooted the forward-looking injunctive claim that had been at the heart of her suit.  The Supreme Court has held that an affirmative-action plaintiff who has only a backward-looking damages claim lacks a cognizable or redressable injury when the record establishes that she would have been denied admission, no matter her race.  *Texas v. Lesage,* 528 U.S. 18, 20-21 (1999) (per curiam).  The summary judgment record here is conclusive that Fisher, because of her academic credentials, would not have been admitted to the fall admissions class, no matter her race.  *Infra* at 13-17.  She therefore has not suffered any cognizable injury, and she therefore cannot establish standing under *Lesage*.  There is nothing "legally" or "morally wrong" with recognizing this patent defect.  Fisher Supp. Br. 3.  Courts are supposed to *avoid* difficult constitutional issues where possible, not leap-frog obvious threshold defects to *reach* out and decide them.

Finally, this Court has the discretion to remand the case to the District Court for that court to reassess the case or oversee any necessary fact development.  As

UT has explained, this Court could only benefit from following that typical course in this case—whether or not this Court believes that the factual record should be reopened.  The Supreme Court's mandate does not deprive this Court of the discretion to have the District Court aid it in carrying out the remand order. Fisher's mandamus threat (at 10 n.1) is not only unbecoming, but hollow.  It does lay bare, however, that, for Fisher, this case is no longer about securing relief (at this point, $100 in application fees) as it is about trying to get back to the Supreme Court as soon as possible to take another swing at *Grutter* and *Bakke*.[1]

## ARGUMENT

## I.   FISHER LACKS STANDING TO PURSUE HER SOLE REMAINING CLAIM FOR RELIEF

This Court asked the parties to address whether there are "remaining questions of standing."  Briefing Order at 2 (Sept. 12, 2013).  The answer is yes— major ones—because of Fisher's inability to show, at this point, any cognizable or redressable injury caused by UT's consideration of race.  *Texas v. Lesage*, 528 U.S. 18, 21 (1999) (per curiam).  Whether those issues are viewed as ones of statutory or prudential standing, or ones of Article III standing, they lead to the conclusion that Fisher's remaining backward-looking damages claim fails at the

---

[1]   The Supreme Court filings referenced in this brief (and others) are available at http://www.utexas.edu/vp/irla/Fisher-V-Texas.html#SupremeCourt.

outset. *See Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011) (discussing statutory standing and Article III standing).

### A. Fisher Lacks Standing Because She Has Suffered No Cognizable Injury Supporting Her Backward-Looking Claim For Relief

This defect is a product of Fisher's own making and the undisputed fact that all but Fisher's claim for money damages has dropped out of this case. Her amended complaint seeks forward-looking injunctive and declaratory relief as well as "[m]onetary damages in the form of refund of application fees and all associated expenses incurred by Plaintiffs in connection with applying for admission to UT." S. Ct. JA 79a. Unlike the plaintiffs in *Grutter* and *Bakke*, Fisher did not bring a class claim. So her standing must rise or fall only on solely her *own* situation.

When this case was brought, the heart of the case was Fisher's claim for injunctive relief demanding reconsideration of the denial of application for admission to UT's Fall 2008 undergraduate class. The moment that Fisher received her diploma from Louisiana State University in May 2012—after this Court decided her first appeal—her forward-looking request for relief became moot, and the case irrevocably changed. *Cf. DeFunis v. Odegaard*, 416 U.S. 312, 319 (1974) (per curiam). After her graduation, Fisher had only one remaining claim that conceivably could keep the case alive: her backward-looking request for money damages amounting to roughly $100—the sum of the application fee and housing deposit she paid when she applied for admission to UT in 2007.

7

Although Fisher had earlier disclaimed her intention to reapply to UT, it was at graduation that her forward-looking claim for injunctive relief conclusively dropped out of the case. At that point, any standing she had to maintain her challenge to UT's decision to deny her application for admission evaporated.

That conclusion is compelled by the Supreme Court's decision in *Texas v. Lesage*—a decision that Fisher astonishingly ignores in her brief, even though UT relied on it in its briefing in support of its suggestion of a remand. In *Lesage*, the Supreme Court held that, where a plaintiff with a backward looking claim for relief challenges a "government decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983." 528 U.S. at 21. In so holding, the Court specifically distinguished cases involving "*forward-looking* relief," in which, the Court stated, a plaintiff "need *not* affirmatively establish that he would receive the benefit in question if race were not considered." *Id.* (emphasis added). *Lesage* involved a backward-looking challenge to the use of race in admissions by UT's education department. The record showed that the plaintiff would not have been admitted "even if the school's admissions process had been completely colorblind." *Id.* at 19. So that was the end of the matter.

*Lesage* discusses Article III standing cases, but also holds that the defendant was entitled to summary judgment (on the merits). *Id.* at 20-22. Circuits have

varied in how they have characterized *Lesage*'s injury rule. Some have referred to *Lesage* as a "standing" rule, without elaborating whether it goes to statutory standing (a limitation by Congress) or Article III standing. *See, e.g.*, *Donahue v. City of Boston*, 371 F.3d 7, 12 (1st Cir. 2004); *Wooden v. Board of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1269 (11th Cir. 2001); *Weser v. Glen*, 190 F. Supp. 2d 384, 393 (E.D.N.Y.), *aff'd*, 41 F. App'x 521 (2d Cir. 2002). Some have said that it is an Article III rule. *See, e.g., Aiken v. Hackett*, 281 F.3d 516, 519 (6th Cir. 2002); *Braunstein v. Arizona DOT*, 683 F.3d 1177, 1186-87 (9th Cir. 2012). And some have applied *Lesage* without discussing standing. *See, e.g., Monteiro v. City of Elizabeth*, 436 F.3d 397, 408 (3d Cir. 2006); *see also* Adam D. Chandler, *How (Not) To Bring an Affirmative-Action Challenge*, 122 Yale L.J. Online 85, 99-100 (2012) (arguing that *Lesage* is not jurisdictional). But whether *Lesage* is viewed as a jurisdictional or non-jurisdictional limit on standing, it compels the conclusion that Fisher's claim fails.

Fisher has no meaningful response. Each of the cases on which she relies in her brief (at 12) to establish standing involved claims for *forward-looking relief.* Indeed, in *Lesage* itself the Supreme Court distinguished two of the cases she cites—*Northeastern Florida Chapter of the Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656 (1993), and *Adarand Contractors, Inc. v. Pena*, 515 U.S. 200 (1995)). *Lesage*, 528 U.S. at 21. The other two cases she cites—*Grutter*

and *Bakke*—involved class claims with requests for *forward-looking relief*. *See Grutter*, 539 U.S. at 317; *Bakke*, 438 U.S. at 270-71. These cases are inapposite because all that remains here is Fisher's backward-looking damages claim.

**B.     The Record Conclusively Establishes That Fisher Would Not Have Been Admitted No Matter Her Race**

Here, as in *Lesage*, there is only one conclusion that can be drawn from the record: Fisher's application would have been denied, no matter her race.

1.  UT's applicant pool is divided into top 10% applicants and other applicants.  Applicants like Fisher, who do not qualify for admission under the top 10% law, are considered under the holistic admissions plan at issue and receive two composite scores:  an Academic Index (AI), which is an objective measure based on high school performance and standardized test scores; and a Personal Achievement Index (PAI), which is based on two essays and a Personal Achievement Score (PAS).  S. Ct. JA 374a.  Essays are scored on a race-blind basis from 1 to 6.  S. Ct. JA 374a-76a.  The PAS score ranges from 1 to 6 as well, and is based on holistic consideration of six factors, one of which is "special circumstances," which in turn is broken down into seven different attributes, one of which is an applicant's racial background.  S. Ct. JA 379a-80a.

After the files in the holistic pool are individually scored, they are plotted on a matrix corresponding to the school or major for which admission is sought, with the applicant's AI score on one axis and PAI score on the other.  Each cell on the

matrix contains all applicants with a particular AI/PAI combination. S. Ct. JA 392a. After considering the number of students in each cell and the available spaces for a particular major or school, admissions officers draw a stair-step line on the matrix, dividing the cells of applicants who will be admitted from those who will be denied. S. Ct. JA 386a-88a. For each cell, admission is an all-or-nothing proposition: all the applicants within a cell are either admitted or denied. PAI scores are fixed long before this step in the process, and applicants clustered within each cell are not identified by race. Admissions officers cannot—and do not— consider the racial demographics of the cell (or the race of any applicant within it) when they draw the stair-step line dividing those who will be admitted from those who will be denied. S. Ct. JA 387a-89a, 411a-12a.

2. The summary judgment record establishes that Fisher would not have been admitted no matter her race, because it shows that she would not have been admitted even if she received a "perfect" PAI of 6. Fisher applied for admission to UT's Fall 2008 freshman class. Fisher had a combined SAT score of 1180 and a cumulative GPA of 3.59. S. Ct. JA 40a-41a. Because Fisher was not in the top 10% of her high school class (S. Ct. JA 40a), her application was considered pursuant to UT's holistic review process. UT in no way seeks to impugn Fisher's credentials, but she simply did not make the cut.

Fisher's *academic* index—an objective statistic based on her high school performance and standardized test scores—was 3.1. S. Ct. JA 415a. Fisher received a "personal achievement index" score substantially lower than 6 (the actual score is contained in a sealed brief filed in the District Court, *see* ECF No. 52). Significantly, the Affidavit of Dr. Kedra Ishop, UT's then-Associate Director of Admissions, submitted by UT in support of summary judgment, stated that even if Fisher had "received a 'perfect' PAI score of 6," she would not "have received an offer of admission to the freshman entering class of fall 2008." S. Ct. JA 416a. That is, due to the stiff competition for admission in the holistic pool in 2008, *all* applicants to the particular schools to which she applied with Fisher's AI and a perfect PAI score of 6 fell within cells on the matrices that were denied admission. That affidavit is uncontradicted—and therefore conclusive on this point. *Cf. Sweet v. Childs,* 507 F.2d 675, 679 (5th Cir. 1975) ("[O]nce a movant carries his burden of showing no genuine issue of material fact, it is the non-movant's burden to rebut this showing with his own 'affidavit or otherwise.'").

In response, Fisher ignores Dr. Ishop's affidavit and fails to cite anything in the summary judgment record that could rebut this evidence. Instead, Fisher relies (at 15-16) on unsupported statements from her own pleadings and a statement by the District Court in connection with the *preliminary injunction* proceeding. But Fisher's own pleadings are insufficient to rebut the sworn and uncontradicted

*evidence* submitted by UT on summary judgment.  In addition, the District Court's statements at the preliminary injunction stage are not binding at the summary judgment stage for the obvious reason that they are preliminary and based on an incomplete marshaling of the facts and law.  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Fisher has pointed to *nothing* in the summary judgment record—and there is nothing—that could rebut UT's evidence that Fisher would not have been admitted to the 2008 class no matter her race.  That is fatal, because she "bears the burden of showing that [s]he has standing for each type of relief sought."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).[2]

Fisher points to statements by UT acknowledging that race is a "'meaningful factor that can make the difference in the evaluation of a student's application.'"  Fisher Supp. Br. 13 (quoting *Fisher*, 631 F.3d at 230); *see id.* at 15-16.  That is certainly true as a general matter.  But it is equally true that, under the matrix system described above, it is possible to say definitely in some cases that race played *no role* whatsoever in the denial of an application.  This is such a case.

---

[2]  Even assuming the figures referred to by the District Court at the preliminary injunction stage are relevant here, they could have referred only to admission to the now-defunct summer program, which used a different admissions process than the one Fisher has challenged throughout this case.  *See* UT S. Ct. Br. 15-16 & n.6.  Fisher did not mention the summer program at all in her prior appeal, and her arguments were trained on the fall admissions plan (which uses matrices).  It is too late in the day for Fisher to revamp her case as a challenge to the summer program, even if she could show a disputed fact issue on whether she would have been admitted to that program, but for UT's consideration of race.

**C.    The Particular Damages That Fisher Has Sought Would Not Redress The Injury She Alleges**

Even if Fisher could show that she had suffered a cognizable injury in connection with the denial of her application, dismissal would still be appropriate because her sole remaining claim for relief would not redress her alleged injury stemming from UT's consideration of race.   As the Supreme Court has held, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

As discussed, Fisher's only remaining claim for relief is a request for monetary damages consisting of her "application fees and all associated expenses." S. Ct JA 79a.  But she would have paid those fees even if UT's admission policy had not considered race at all, and even if she had been admitted to UT—*i.e.*, even if she had not suffered the injury of which she complains.  Damages in the amount of her application fees, therefore, cannot redress her alleged injury, or be viewed as "reimbursement for" that alleged injury.  *Steel Co.*, 523 U.S. at 106-07.

That independent redressability defect cannot be remedied at this point.  A claim for nominal or compensatory damages may not be inferred from the boilerplate language at the end of her complaint—asking for "[a]ll other relief this Court finds appropriate and just"—in order to save this case from dismissal.  *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 58-60, 71 (1997); *accord*

*Fox v. Board of Trustees of the State Univ. of N.Y.*, 42 F.3d 135, 142 (2d Cir. 1994); *Thomas R.W. ex rel. Pamela R. v. Massachusetts Dep't of Educ.*, 130 F.3d 477, 480 (1st Cir. 1997).  It is also too late in the day for an amendment, and this Court must in any event evaluate the case before it solely by reference to the complaint as it stands today.  *See Alvarez v. Smith*, 130 S. Ct. 576, 580 (2009).[3]

### D.    Fisher Has Provided No Reason To Ignore These Patent Defects

Fisher's main submission on standing is that this Court simply *must* ignore the "elephant in the room."  Not so.

1.  Fisher argues (at 10-12) that this Court is *forbidden* from considering these threshold defects "under the mandate rule" because "the Supreme Court *necessarily* found that Ms. Fisher has standing."  That argument assumes that *Lesage* establishes a jurisdictional limit.  But as discussed, *Lesage* also may be read as establishing a rule of statutory standing or a bar to liability, in which case the rule is not jurisdictional and the Supreme Court plainly was not obligated to

---

[3]  Nor is it possible to avoid this defect by recharacterizing Fisher's request for relief as one for "restitution" instead of "damages" (as she claimed).  "Restitution and damages are different remedies."  *Schlueter v. Latek*, 683 F.3d 350, 353-54 (7th Cir. 2012) (Posner, J.).  And, in any event, the requested application fees would not redress Fisher's claimed injury, whether she labels it "monetary damages" or "restitution."  Nor does the fact that the parties agreed to bifurcate liability and remedies shield Fisher from the *Alvarez* rule or mean that this Court must ignore the blatant standing and redressability problems stemming from the nature of the alleged injury and sole remaining request for relief, which require dismissal at this stage.  If this Court has any doubt about that conclusion, it should remand the case for the District Court to address its order.

address it.  Indeed, if the Court interpreted *Lesage* as a rule of prudential standing or liability, then it would have been outside the question presented.

In any event, this Court should not read the Supreme Court's decision as *holding* that Fisher satisfied *Lesage*.  The Supreme Court has cautioned against reading Supreme Court decisions that do not explicitly discuss jurisdiction as making jurisdictional holdings.  *See Steel Co.,* 523 U.S. at 91 ("We have often said that drive-by jurisdictional rulings of this sort … have no precedential effect.").  In *Steel Company*, the Court was referring to rulings that actually grappled with specific issues, but simply did not specify whether it regarded them as *jurisdictional* or not.  Here, although several Justices asked about it oral argument, the Supreme Court's decision did not in any way address whether Fisher had suffered a cognizable or redressable injury.  And *Steel Company*'s concern about "drive-by jurisdictional rulings" is squarely implicated given the debate over whether *Lesage* establishes an Article III or liability-based rule.[4]

2.   Fisher also states (at 12) that "this Court has already correctly held that Ms. Fisher has standing, and nothing has occurred since then to undermine that conclusion."  This Court did find standing in its prior decision.  *See Fisher*, 631 F.3d at 217.  But Fisher's inability, under *Lesage*, to assert a cognizable injury was

---

[4]   Because there is no basis to conclude that the Supreme Court actually decided the *Lesage* issue in its decision, the Supreme Court did not make any "law of the case" on that issue either.  Supp. Br. 11-12.

not conclusive until *after* Fisher graduated from LSU in May 2012 (after this Court's decision), at which point her claim for forward-looking relief indisputably became moot. *Cf. DeFunis*, 416 U.S. at 319. In addition, while UT did raise standing and mootness questions concerning *all* of Fisher's claims in the prior appeal, UT Opening Br. 5-7—UT did not specifically cite *Lesage* or highlight the redressability problem with Fisher's sole remaining request for monetary damages. So this Court did not have the opportunity to address *Lesage* in the prior appeal.[5]

Even if this Court believes that UT could have (or should have) better developed these arguments in the prior appeal, it should still consider them now. To the extent that there is an Article III defect, it is jurisdictional and cannot be waived. To the extent it is not, UT indisputably raised *Lesage* before the Supreme Court. UT S. Ct. Br. 15-16 n.6; S. Ct. Oral Arg. Tr. 54-57. Fisher never claimed the argument was waived. Fisher S. Ct. Reply Br. 3 n.1. Nor did Fisher argue waiver in opposing a remand, even though UT relied on *Lesage* in its statement concerning proceedings on remand. *Cf. Clayton v. ConocoPhillips Co.*, 722 F.3d

---

[5]  Fisher claims (at 12) that UT has "change[d]" its position on standing. In the prior appeal, UT argued that Fisher's forward-looking claims for relief were moot. UT Opening Br. 5-7. UT acknowledged that Fisher's money damages claim *might* not be moot, claiming that—"at most"—Fisher's damages claim still remained. *Id.* at 7. But UT also argued that her damages claim was "dubious," *id.*, and stated that "most (*if not all*) of Plaintiff's claims for relief are now moot." *Id.* at 5 (emphasis added). The standing arguments discussed here are properly viewed as an elaboration on the arguments raised by UT in the prior appeal, and UT specifically raised these arguments before the Supreme Court. Fisher never argued that these arguments were waived, and so forfeited any such argument.

279, 299 (5th Cir. 2013). Moreover, nothing in this Court's prior opinion would preclude it from considering UT's *Lesage* argument here. At bottom, the law of the case doctrine is a discretionary doctrine. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). As other circuits have held, "the federal courts' unyielding obligation to uphold statutory and constitutional limitations on jurisdiction should not bend to less important prudential notions of comity and finality." *Public Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 119 (3d Cir. 1997) (joined by Alito, J.).

3. Finally, Fisher's argument (at 14-15) that courts *must* decide the constitutionality of race-conscious plans before deciding whether plaintiffs have actually been injured by those plans is not only refuted by *Lesage*, but is fundamentally at odds with the "'longstanding principle of judicial restraint [that] requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.'" *Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011); *see PDK Labs. Inc. v. United States DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (same). Respecting that "longstanding principle of judicial restraint" is especially important in cases, like this one, presenting momentous issues of constitutional law. *See Elk Grove Unified Sch. Dist. v. Newdow*, 124 S. Ct. 2301, 2308 (2004) ("The command to guard jealously and exercise rarely our power to make

18

constitutional pronouncements requires strictest adherence when matters of great national significance are at stake.").

Fisher's policy arguments for ignoring the glaring threshold defects in this case are all the more unpersuasive because she faces a problem entirely of her own making.  As one commentator has observed, this case is  "botched beyond repair" and simply has become an "empty vehicle for ideological struggle."  Chandler, *supra*, 122 Yale L.J. Online at 85, 95.  Because these defects are a product of Fisher's own litigation strategy, dismissing this case for lack of any cognizable or redressable injury under *Lesage* would not hamper plaintiffs in more typical cases.

Finally, the Court should reject Fisher's disingenuous attempt to impugn UT's motives for raising these clear threshold defects.  *See* Fisher Supp. Br. 2 (deriding UT's standing argument as an "evasive tactic[]" and "strategic machination[]").  The judicial process is advanced when parties bring fundamental threshold defects, including lack of standing, to the attention of the Court.  And avoiding major constitutional issues when cases can be decided on threshold grounds is neither "legally" nor "morally wrong."  *Id.* at 3.  It is, quite the contrary, a "'longstanding principle of judicial restraint.'"  *Camreta*, 131 S. Ct. at 2031.

## II.   UT HAS ESTABLISHED THAT ITS ADMISSIONS PLAN IS NARROWLY TAILORED TO ITS EDUCATIONAL OBJECTIVES

On the merits, this Court has asked how it "ought [to] apply strict scrutiny as directed by the Supreme Court on the record now before it," if it "elects not to remand." Briefing Order at 1.  The answer is the Court should hold—in resolving the issue remanded by the Supreme Court—that UT has established that "its admissions program is narrowly tailored to obtain the educational benefits of diversity." *Fisher*, 133 S. Ct. at 2421.   As the District Court and this Court previously held, UT's decision to reintroduce race as one modest factor among many in its holistic review process is narrowly tailored under *Bakke* and *Grutter*, because (1) the admissions process respects the individual dignity and accomplishments of each applicant without making race a predominant factor; (2) there was no workable race-neutral alternative; and (3) UT's modest consideration of race meaningfully and directly advances its educational objective.   Those conclusions hold true—according UT no deference on narrow tailoring.

In her supplemental brief (at 22-38), Fisher also renews her challenge to UT's determination that it lacked a "critical mass" when it adopted the plan at issue (or denied her application).  That argument lacks merit, for reasons this Court previously recognized.  *Fisher*, 631 F.3d at 236-38.   But more important for present purposes, this critical mass argument goes to whether UT had a compelling interest to adopt a race-conscious plan at all—as Fisher herself recognized in

briefing the prior appeal, *see* Fisher Opening Br. 38-47; Fisher Reply Br. 4-5. It does not concern whether the *means* adopted by UT to address that objective are permissible—*i.e.*, the constitutionality of the plan "in its *implementation*." *Fisher*, 133 S. Ct at 2420-21 (emphasis added). Accordingly, there is no need for this Court to revisit Fisher's mistaken argument that UT had all the student body diversity that the Constitution allowed it to seek in 2004 (or 2008).

### A. The Supreme Court Accepted Existing Law "As Given" In Fisher And Remanded For Consideration Of Narrow Tailoring

Before the Supreme Court, Fisher and her amici struck out in their effort to dismantle the Supreme Court precedent that governed the prior appeal in this case. Despite Fisher's full-throated arguments both directly and indirectly challenging *Grutter* and *Bakke*, the Supreme Court—by a 7-1 vote—did not change that precedent at all. To the contrary, it accepted those decisions "as given." *Fisher*, 133 S. Ct. at 2417. And the Supreme Court disagreed with this Court in only one respect: it concluded that this Court gave undue deference to UT on the narrow-tailoring inquiry required by *Grutter*. *Id.* at 2421.

1. In reiterating the applicable strict scrutiny analysis under *Bakke* and *Grutter*, the Court first recognized (as even Fisher concedes) that "the interest in the educational benefits that flow from a diverse student body" is a "compelling interest that could justify the consideration of race." *Id.* at 2417. The Court also endorsed Justice Powell's view that "[t]he academic mission of a university is a

'special concern of the First Amendment,'" and that universities must have some discretion, within limitations, to determine 'who may be admitted to study.'"  *Id.* at 2418 (citations omitted).  And the Court endorsed Justice Powell's conception of a university's "interest in securing diversity's benefits." *Id.*  As the Court reiterated, "'[i]t is not an interest in simple ethnic diversity'"—the way Fisher has conceived of it, with her emphasis on specific percentages and crude aggregation of different racial and ethnic groups. *Id.* (quoting *Bakke*, 438 U.S. at 315 (op. of Powell, J.)). Instead, "'[t]he diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial and ethnic origin is but a single though important element.'" *Id.* (same).

The Supreme Court also confirmed that "a university's 'educational judgment that *such diversity* is essential to its educational mission is one to which [the courts] *defer*.'"  *Id.* at 2419  (emphasis added) (quoting *Grutter*).  "On this point," the Supreme Court held, "the District Court and Court of Appeals were correct in finding that *Grutter* calls for deference to the University's conclusion, 'based on its experience and expertise.'" *Id.* (citations omitted).

2.   Moving on to the second prong of the strict scrutiny analysis, the Court reiterated that "[t]he *particular admissions process used* for this objective" must be "narrowly tailored." *Id.* at 2418 (emphasis added).  That is, the Court explained, a

university must show that the challenged "admissions process meets strict scrutiny *in its implementation*." *Id.* at 2420 (emphasis added).

Again, it left *Grutter* and *Bakke* untouched. "'To be narrowly tailored,'" the Court elaborated, "'a race-conscious admissions program cannot use a quota system,' but instead must 'remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application.'" *Id.* at 2418 (quoting *Grutter*, 539 U.S. at 334). "[A]s the Court said in *Grutter*," the Court reminded, "it remains at all times the University's obligation to demonstrate, and the Judiciary's obligation to determine, that admissions processes 'ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of her application.'" *Id.* at 2420 (quoting *Grutter*, 539 U.S. at 336-37). "On this point, the University receives no deference." *Id.*

The Court continued that "[n]arrow tailoring also requires that the reviewing court verify that it is 'necessary' for a university to use race," which "involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications," *i.e.*, by availing itself of "'workable race-neutral alternatives.'" *Id*. at 2420 (quoting *Grutter*, 539 U.S. at 339-40). "'[N]arrow tailoring does not require exhaustion of every *conceivable* race-neutral alternative.'" *Id.* (quoting *Grutter*, 539 U.S. at 339-40). But a "reviewing court

must ultimately be satisfied that no workable race-neutral alternative would produce the educational benefits of diversity." *Id.* "If 'a nonracial approach … could promote the substantial interest about as well and at tolerable administrative expense,' then the university may not consider race." *Id.* (quoting *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 280 n.6 (1986)).  The university bears the burden of showing "that available, workable race-neutral alternatives do not suffice." *Id.* But the Court also stated that, in undertaking this inquiry, a reviewing "court *can* take account of a university's experience and expertise in adopting or rejecting certain admissions processes." *Id.* (emphasis added).

3.    The Supreme Court held that this Court erred in applying that settled law on narrow tailoring by "conclud[ing] that 'the narrow-tailoring inquiry—like the compelling-interest inquiry—is undertaken with a degree of deference to the Universit[y].'" *Id.* (quoting 631 F.3d at 232).   The Court explained that "expressions of the controlling standard [in this Court's decision are] at odds with *Grutter*'s command that 'all racial classifications imposed by the government "must be analyzed by a reviewing court under strict scrutiny."'" *Id.* at 2421 (quoting *Grutter*, 539 U.S. at 326).   The Court elaborated that "[s]trict scrutiny does not permit a court to accept a school's assertion that its admissions process *uses* race in a permissible way without a court giving close analysis to the evidence of *how the process works in practice*." *Id.* at 2421 (emphasis added).  Because the

24

Court concluded that this Court and the District Court had erred in according

deference on narrow tailoring, it vacated and remanded the case to address:

whether UT "has offered sufficient evidence that would prove that its admissions

program is narrowly tailored to obtain the educational benefits of diversity." *Id.*

Despite Fisher's numerous challenges to UT's plan—including her lead

argument that UT had engaged in "racial balancing"—the Court did not hold that

the plan was invalid in any respect.  Nor did the Court take issue with any factual

statement made by this Court or the District Court concerning the implementation

and impact of the challenged admissions plan, the history leading up to UT's

adoption of that plan, the race-neutral alternatives considered by UT before

adopting the plan, the state of student body diversity at UT during the time frame

in question, or the implementation and shortcomings of the Top 10% law.  Nor did

the Court question the legitimacy of UT's objectives in adopting the policy at

issue.  Instead, without questioning any of that in its decision, the Court sent the

case back for reconsideration of the narrow-tailoring analysis in light of its

decision reiterating that *Grutter* and *Bakke* do not provide for deference on narrow

tailoring.

In her supplemental brief (at 25-26), petitioner renews her argument that the

Court should superimpose on top of *Grutter* and *Bakke*'s strict- scrutiny analysis a

"strong basis in evidence" test.  This Court properly rejected that argument in the

prior appeal. *See Fisher*, 631 F.3d at 232-34; UT S. Ct. Br. 49-50. This argument featured prominently in Fisher's Supreme Court brief and was pressed by her amici as well. But the Supreme Court did not bite and, instead, accepted *Grutter* and *Bakke* "as given." *Fisher*, 133 S. Ct. at 2417. "[A]s given," those decisions plainly do not impose a "strong basis in evidence" test. That conclusion is underscored by Justice Thomas's separate opinion in *Fisher* explaining that he would *overrule Grutter—*and *replace* it with the "strong basis in evidence" test. *Id.* at 2422-23 (Thomas, J., concurring). In other words, Fisher's renewed argument that the "strong basis in evidence" test governs this case has even less currency today than when this Court previously rejected it.

### B.    The Record Establishes That UT's Admissions Policy Is Narrowly Tailored To Obtain The Educational Benefits Of Diversity

UT has met its burden in establishing that its admissions policy is narrowly tailored—*i.e.*, that it is constitutional "in its *implementation.*" *Id.* at 2419-20 (emphasis added). Although UT, if needed, could introduce additional evidence supporting this Court's prior conclusion that UT's plan is narrowly tailored under *Grutter* and *Bakke*, Fisher's objection is not really about the *sufficiency* of UT's evidence. Indeed, as she emphasizes (at 6), she has accepted the material facts as undisputed and simply disagrees with *legal* conclusion to draw from those facts. Even without deference to UT, however, her challenge fails.

1.    **UT's Policy Meets Or Exceeds The Benchmarks The Supreme Court Has Set For The Implementation Of A Constitutional Race-Conscious Admissions Policy**

In *Grutter*, the focus of the Supreme Court's narrow-tailoring analysis—and the principal point of disagreement between the majority and Justice Kennedy—concerned whether the plan's consideration of race was sufficiently individualized and nuanced. *Grutter*, 539 U.S. at 334-39; *id.* at 389-93 (Kennedy, J., dissenting). In her supplemental brief, Fisher does not seriously challenge that this requirement is met here. For good reason. As this Court has found, every key aspect of UT's admissions policy closely tracks—or if anything improves upon—the admissions plan upheld in *Grutter*. *See, e.g.*, *Fisher*, 631 F.3d at 218 (agreeing with the District Court's finding that "'it would be difficult for UT to construct an admissions policy that more closely resembles the policy approved by the Supreme Court in *Grutter*'"); *id.* at 259 (Garza, J., concurring) (noting UT's policy is virtually "identical to the program" approved by the Supreme Court in *Grutter*).

This Court described UT's admissions policy in detail in its prior decision. *Fisher*, 631 F.3d at 226-31; *see* UT S. Ct. Br. 12-15. To summarize, race is but one of many factors considered, in the context of an applicant's full file, along with her various academic achievements (beyond grades and test scores), her potential to contribute to geographic diversity, socioeconomic diversity, cultural diversity, and so on. The object of UT's holistic review process is to "examine the student in

27

'their totality,' 'everything that they represent, everything that they've done, everything that they can possibly bring to the table.'" S. Ct. JA 129a. Race is not a *predominant* factor—it is, as the District Court put it, "a factor of a factor of a factor of a factor" in UT's holistic full-file review. *Fisher*, 645 F. Supp. 2d at 608.

UT's admissions process also ensures that race is considered only in an individualized and holistic fashion. It is undisputed that UT assigns no fixed numerical bonus to an applicant on the basis of her race or ethnicity. S. Ct. JA 397a Any applicant—of any race—can benefit from UT's contextualized consideration of race. S. Ct. JA 381a, 206a-07a, 2874a-85a. And race is considered by UT only in calculating the PAI score—which *is* done on an entirely individualized and holistic basis. UT S. Ct. Br. 25-26.

From the standpoint of the narrow-tailoring focus in *Grutter* and *Bakke*, therefore, it is clear that UT's plan passes muster. That, presumably, is why Fisher does not seriously argue the point in her supplemental brief.

## 2. The Record Establishes That There Are No Workable Race-Neutral Alternatives To UT's Policy

The evidence also confirms UT's conclusion—when it adopted and applied the policy at issue—that there was no workable race-neutral alternative to adding race as one modest factor among many in its holistic review process. Indeed, for more than seven years, UT tried race-neutral tools ranging from recruiting, scholarships, use of socio-economic factors in holistic review, and the Top 10%

28

law—before adopting the plan at issue.  During that time African-American enrollment dropped nearly in half by 2002, enrollment of underrepresented minorities generally remained stagnant or worse, and their odds of admission worsened in the holistic admissions process compared to other students.  *Infra* at 36.  As the District Court observed in a similar vein, anyone who believes that UT did not try out race-neutral alternatives before adopting the policy at issue just "ignore[s] the facts of this case."  *Fisher*, 645 F. Supp. 2d at 610.[6]

1.  In addition to the Top 10% law, the record is replete with evidence showing that UT made tremendous efforts to boost minority enrollment through race-neutral means, including intensifying outreach efforts and making adjustments to its PAI index to strengthen the effect of socio-economic and related factors.  S. Ct. JA 399a-402a.  But UT concluded, after years of experience, that simply seeking socio-economic diversity—while helpful and important in its own right— would not indirectly produce racial diversity as well.  S. Ct. JA 112a-13a.  UT's experience with socio-economic factors is not unique.  *See* S. Ct. Amicus Br. for Amherst College and 36 Additional Private Colleges and Universities at 10-11, 21-

---

[6]  Fisher's claim (at 26) that UT adopted a race-conscious admissions policy *first*, then simply "reverse-engineered" its 2004 proposal is a good example of how Fisher overlooks the facts, not to mention the findings of this Court and the District Court.  *See Fisher*, 631 F.3d at 237; *Fisher*, 645 F. Supp. 2d at 606-07.  UT did not propose to modify its policy to consider race in its holistic review until after it had completed a year-long inquiry into the matter—against the backdrop of its seven-plus years' experience, post-*Hopwood*, in attempting to foster student body diversity without considering race at all.  S. Ct. JA 395a-97a.

24 (explaining that seeking economic diversity, while educationally beneficial in its own right, will not produce racial diversity and that plans focused solely on economic diversity would crowd out minority applicants); William G. Bowen & Derek Bok, *The Shape of the River* 51 (1998) ("[T]here are almost six times as many white students as black students who both come from [socio-economically disadvantaged] families and have test scores that are above the threshold for gaining admission at an academically selective college or university."). Fisher's argument (at 38-39) that greater emphasis on socioeconomic factors offers a workable alternative to the consideration of race in holistic review is just one of many discredited ways in which she is really challenging the use of race *at all* in university admissions.

In the years between *Hopwood* and *Grutter*, UT also increased its annual recruitment budget, opened three more regional admissions offices in areas with highly concentrated minority population, increased its financial aid for minority students, created promotion materials and campaigns geared towards dispelling UT's image as a minority-hostile institution, and conducted studies on other ways to improve diversity on campus through race-neutral means. S. Ct. JA 398a-402a. Despite Fisher's disingenuous claims (at 29-30, 46-47) that UT seeks only to admit "privileged" minorities, many of these programs targeted students—of all races— from lower socioeconomic backgrounds. S. Ct. JA 274a-76a, 399a-400a.

In all these efforts, UT has had to address the lingering perception—rooted in a painful history that includes *de jure* segregation and longstanding discrimination against African-Americans and Hispanics—that "[UT] is largely closed to nonwhite applicants and does not provide a welcoming supportive environment to underrepresented minority students."  S. Ct. Supp. JA 14a; *see* UT S. Ct. Br. 4 n.1; *see generally* S. Ct. Amicus Br. for Family of Heman Sweatt *et al.* And still, despite such efforts, UT experienced an immediate and serious decline in enrollment of underrepresented minorities after *Hopwood*—in just two years, for example, African-American enrollment dropped by 40%.  *See* UT S. Ct. Br. 7-8. In recognition that such measures were *not* a workable alternative, the Texas Legislature adopted the Top 10% law, which took effect in 1998.  It is the existence of that law on which Fisher focuses her challenge.

2.  Fisher's primary argument on narrow tailoring rests on the proposition— rejected by the Supreme Court in *Grutter* itself—that percentage plans are a complete, workable alternative to considering race in holistic review.  *See, e.g.*, Fisher Supp. Br. 37 ("[A]llowing the Top 10% law to achieve its *full* potential would increase minority enrollment at least as much or more than the use of racial classifications in admissions decisions") (emphasis added)).  This Court has already rejected that argument.  As the Court put it, "percentage plans may be a race-neutral means of increasing minority enrollment, [but] they are not a workable

alternative … because 'they may preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university.'" *Fisher*, 631 F.3d at 239 (quoting *Grutter*, 539 U.S. at 340).

The Top 10% law has many pluses, including the fact that it provides a well-deserved opportunity for students across Texas to attend the State's flagship public institution.  But no selective university in America selects all of its students based solely on class rank or GPA.  And the reason is that such a mechanical method of admissions sacrifices student body diversity in a broad—and *constitutional*—sense.  As the Supreme Court reiterated in *Fisher*, "'[t]he diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.'"  *Fisher*, 133 S. Ct. at 2418 (quoting *Bakke*, 438 U.S. at 315) (op. of Powell, J.).  UT's holistic admissions process—which applies to about a quarter of the incoming class each year—complements the systematic drawbacks of the percentage plan by seeking to enhance student body diversity in the broadest sense.

The Top 10% law—valuable as it is—is not a complete, workable substitute for UT's more nuanced admissions policy.  As this Court found, "[t]he reality is that the Top Ten Percent Law alone does not perform well in pursuit of the diversity *Grutter* endorsed and is in many ways at war with it."  631 F.3d at 240.

As this Court explained, percentage plans "bluntly operate[] as an attempt to create diversity through reliance on perceived group characteristics and segregated communities" and "crowd[] out other types of diversity that would be considered under a *Grutter*-like plan." *Id.* at 240 & n.150; *see* Catherine L. Horn & Stella M. Flores, *Percent Plans in College Admission: A Comparative Analysis of Three States' Experiences* 14-15 (2003). UT has sensibly concluded that selecting its *entire* class based on class rank alone not only would compromise its interests in "academic selectivity" (*id.* at 240 n.149), but would impede its efforts to "assembl[e] a student body that is … diverse along all the qualities valued by the university,'" *id.* at 239 (quoting *Grutter*, 539 U.S. at 340).

Fisher charges (at 41) that applicants admitted through the Top 10% Law "perform *better* than those admitted through" race-conscious holistic review. That generalization does not accord with UT's experience. And while the vast majority of students from *both* admissions pools succeed at UT, the fact is that the average SAT score for both African-Americans and Hispanics admitted through holistic review in 2005 was higher than that for their counterparts admitted through the Top 10% law. S. Ct. Supp. JA 163a-64a. Perhaps that is why Stuart Taylor—one of the authors of the so-called "mismatch" theory (which has been discredited, *see, e.g.,* S. Ct. Amicus Br. of Empirical Scholars) said "that if he were forced to choose, UT would be better off dropping the 10% plan and taking race into account

directly through a holistic evaluation." Jess Bravin, *Justices Face A Test On Race: A University Of Texas Admissions Policy Aims To Help High-Scoring Minorities*, Wall St. J, Oct. 8, 2012, *available at* http://online.wsj.com/news/articles/ SB10000872396390443294904578044561424368452. That candid remark (from one of Fisher's most outspoken supporters) just further confirms that the Top 10% law is not a complete, workable alternative.

UT selects its students from a highly competitive applicant pool that contains far more qualified candidates than it can enroll. Many of the students—of all races—competing for spots in the holistic pool are admitted to Ivy League and other top schools. Especially given the modest and individualized way in which race is considered in holistic review, Fisher's attempt to suggest that students admitted through the Top 10% law are "better" is entirely unpersuasive.

3. The Supreme Court has held that race-neutral methods are not "workable" if they would have a significant "detrimental effect" on a university's mission. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 509-10 (1989). And they are not genuine "alternative[s]" unless they would serve the university's compelling interest "'about as well'" as the race-conscious plan. *Wygant*, 476 U.S. at 279 n.6. No deference is necessary to reach the conclusion that the Top 10% law comes up short on those yardsticks as a complete alternative to UT's consideration of race in its holistic admissions pool. The same goes for the other

alternatives floated by Fisher.  And to complete the point (and answer this Court's question), there were no "workable alternatives … available to the University that were not being deployed."  Briefing Order at 2.

Ultimately the proof is in the pudding.  The record establishes that UT tried the gamut of race-neutral alternatives—including the Top 10% law—during the period between *Hopwood* (1997) and *Grutter* (2003).  Yet, during that period, African-American enrollment dropped precipitously to just 3% of the student body in 2002, S. Ct. JA 127a; enrollment among underrepresented minorities in general remained stagnant or worse, *id.*; and the odds of admission for African-Americans and Hispanics in the holistic pool fell (while the odds of admission for white students *increased*), *Fisher*, 631 F.3d at 224.  In other words, UT's own history convincingly shows that Fisher's much-touted alternatives did not work.

### 3.    UT's Holistic Admissions Plan Directly And Meaningfully Advances UT's Interest

This Court also should reject, again, Fisher's argument (at 35-37) that UT's use of race in holistic admissions is too *modest* to be constitutional.  In the kind of individualized and holistic review sanctioned by *Grutter* and *Bakke*, race does not predominate but instead plays only a nuanced and limited role in admissions.  *Grutter*, 539 U.S. at 337; *Bakke*, 438 U.S. at 318 (op. of Powell, J.); *see also Grutter*, 539 U.S. at 387 (Kennedy, J., dissenting) (race may be "one, nonpredominant factor" in such a system).  In that regard, the nuanced and modest

way in which UT's holistic review plan takes race into account is a constitutional *plus*, not a minus.   It is unrealistic to expect that an appropriately modest consideration of race will have a dramatic or lopsided impact on admissions.   As this Court previously recognized, the Supreme Court has never suggested that a *Grutter* plan cannot be deployed in conjunction with race-neutral alternatives.   631 F.3d at 246 (distinguishing *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 792 (2007)).   It is therefore not surprising that Justice Kennedy responded to this argument by observing, "I see an inconsistency here." S. Ct. Oral Arg. Tr. 23.   Inconsistency, indeed.   In fact, this argument is yet another example of how Fisher is seeking to thwart *Grutter* indirectly by creating a "heads I win, tails you lose" regime for universities that consider race.

In any event, the record establishes that UT's nuanced consideration of race *has* had a meaningful impact in advancing UT's diversity objective.   For starters, it is undisputed that UT's "consideration of race … does increase the level of minority enrollment," and that "race is a *meaningful* factor and can make a difference in the evaluation of a student's application."   *Fisher*, 645 F. Supp. 2d at 610 n.14 (emphasis added); *see* S. Ct. JA 130a (admitting that "[t]he addition of race as a factor in admissions has increased enrollment of under-represented minorities.").   That evidence, in itself, ought to be the end of that matter.

Yet there is more. The record shows that African-American and Hispanic enrollment increased significantly after the adoption of UT's policy in 2004. S. Ct. Supp. JA 156a. Moreover, African-American enrollment at UT *doubled* from 2002 to 2008—from about 3% to 6%. S. Ct. Supp. JA 156a. At the same time, in 2008, a full 20% of all African-American admits were offered admission through full-file review, as were 15% of all Hispanic admits. S. Ct. Supp. JA 158a. The adoption of the plan also offset the declining odds of admission that African-American and Hispanic applicants had experienced. *Fisher*, 631 F.3d at 224. These figures all demonstrate that the addition of race to holistic review directly advances UT's objective. In her supplemental brief, Fisher not only fails to account for this evidence, but improperly dismisses the significant impact that the addition of even a relatively small number of underrepresented minorities can have on campus. *See* S. Ct. NAACP LDF Amicus Br. 26-28.

Moreover, as this Court recognized, attaining the educational benefits of diversity is not a one-dimensional pursuit. Holistic review allows UT to select for "other types of diversity" that the percentage plan tends to "crowd[] out," 631 F.3d at 240; *see also id.* at 240 n.150; *Bakke*, 438 U.S. at 324 (op. of Powell, J.). The students selected through holistic review are among the most talented, academically promising, and well-rounded students at UT—students who, in UT's experience, have great potential to be change agents on campus and make a

difference in promoting cross-racial understanding and breaking down racial stereotypes. In short, the holistic plan makes an important and qualitatively meaningful contribution to broad diversity at UT—for the simple reason that it considers each applicant in his or her totality, rather than class rank alone.

As was true the last time this Court rejected this argument, the centerpiece of Fisher's argument is her claim (at 34-35) that the consideration of race could only have resulted in "33 additional [underrepresented] students" comparing the 2004 and 2008 admissions years. That contention not only ignores the qualitative contributions of the holistic plan to diversity, but is highly misleading. This figure fails to account for the fact that, in 2008, UT experienced an unprecedented surge in admissions under the Top 10% law—to over 80% of the entire class—which had the effect of crowding out the holistic class altogether. S. Ct. Supp. JA 157a. Fisher's "33" figure also ignores Texas admits who chose not to enroll at UT and non-Texas admits who did enroll at UT. Using Fisher's own methodology, 126 and 173 underrepresented minorities were admitted in 2006 and 2007, respectively, through holistic review. S. Ct. U.S. Amicus Br. 33-34. And taking into account the entire holistic pool and adjusting for the unique context of the 2008 admissions cycle, the holistic policy would have admitted approximately 200 underrepresented minorities in 2008—all students who, by definition, would not have been admitted through the percentage plan. S. Ct. JA 170a.

The plan's impact, in short, is hardly "negligible" Fisher Supp. Br. 36.

### 4.     Petitioner's Remaining Narrow-Tailoring Arguments Fail

Petitioner lodges several additional objections to the way in which UT's holistic admissions plan works.  Those arguments also lack merit.

1.   Fisher renews (at 43) her argument that UT's policy lacks "a meaningful termination point."   This argument primarily consists of misrepresenting UT's objective as a "goal of demographic parity" (at 42), a discrete interest in "classroom diversity" (at 43), or an interest in "promot[ing] affluence instead of race" (at 47).  But these objectives are concocted by Fisher.  As this Court—and, indeed, the Supreme Court—have recognized, UT's objective is in "obtain[ing] the educational benefits of diversity." *Fisher*, 133 S. Ct. at 2421; *see Fisher*, 631 F.3d at 230.  Fisher's continued attempts to recast UT's actual objective in student body diversity are still baseless. *See* UT S. Ct. Br. 28-31, 43.

As for UT's actual objective, Fisher's argument is refuted by *Grutter* itself. *Grutter* rejected the notion that universities must tailor their policies to achieving specific racial targets or figures—which the Court characterized as "outright racial balancing."  539 U.S. at 329-30.  Likewise, in *Fisher,* the Supreme Court reiterated that the diversity that matters is not an interest in a student body with "'specified percentage[s]'" of students from particular races. *Fisher*, 133 S. Ct. at 2418 (quoting *Bakke*, 438 U.S. at 315 (op. of Powell, J.)).  Nevertheless, Fisher still

essentially argues that UT's policy is not narrowly tailored because it does *not* set a specific target or percentage for diversity—*i.e.*, a quota.

As *Bakke*, *Grutter*, and *Fisher* recognize, the constitutional diversity objective is a more nuanced concept—and one that is inherently bound up with educational judgments as well.  That interest simply does not lend itself to the kind of numerical precision or bright-line targets that Fisher has in mind.  Insisting on such precision is just a thinly veiled assault on *Grutter* itself.  Indeed, Fisher is in effect asking the courts to adopt a regime in which a plan is unconstitutional if it does *not* set numerical targets and is unconstitutional if it *does* (as racial balancing).  *Bakke*, *Grutter*, and now *Fisher* reject that regime.  Instead, as the Supreme Court held in *Grutter*, a plan is narrowly tailored in this sense if calls for "periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity."  539 U.S. at 342.  UT's plan satisfies that requirement:  It explicitly calls for periodic review of the need for race-conscious admissions. S. Ct. Supp. JA 32a.  Consistent with that provision, UT has reviewed its policy on an annual basis. *Fisher*, 631 F.3d at 223, n.47; *see infra* at 48-49.

In any event, this case is a particularly poor vehicle in which to revisit those endpoint arguments because, unlike *Grutter*, Fisher has only a backward-looking damages claim that is limited to whether UT's policy was constitutional in 2008.[7]

2.  Fisher renews her contention (at 47-49) that the plan unfairly treats Asian-American applicants (because they are *not* named as underrepresented minorities).  A similar argument was made in *Grutter*, since the plan upheld in that case likewise did not define Asian-Americans as underrepresented minorities.  *See Grutter*, Petr. Br. 19, 28.  And of course, the Supreme Court did not conclude that the plan's classification of underrepresented minorities was invalid.  To the contrary, the Court affirmed the appropriateness of focusing on such "underrepresented minority students."  *Grutter*, 539 U.S. at 337-38.  There is no basis for this Court to credit this argument here.  Not only does the record establish that any student of any racial background—including Asian-American students—can benefit from the contextualized consideration of race in UT's holistic full-file review, but it shows that Asian-American applicants have for years gained admission to UT at higher rates than any other group (including white applicants).  *See* UT S. Ct. Br. 45; S. Ct. Supp. JA 43a, 156a.

---

[7]  Fisher objects (at 31) to the fact that UT has not published its *five-year* review of the policy.  UT has engaged in that review, as well as annual reviews.  The fact that UT has not issued a written five-year review during the pendency of this litigation does not undermine the constitutionality of its policy, especially when it comes to Fisher's backward-looking damages claim concerning the denial of her application in 2008—before any five-year review was even triggered.

Fisher also complains (at 49) about the fact that UT's application does not delineate separate categories for applicants with different backgrounds of Asian descent. But the application permits students to elaborate on or clarify aspects of their racial/ethnic background and relevant experiences through one or more essays—including an optional essay that permits applicants to discuss virtually anything that has "'shaped or impacted your abilities or academic credentials, personal responsibilities, exceptional achievements or talents, educational goals, or ways in which you might contribute to an institution committed to creating a diverse learning environment.'" S. Ct. JA 376a.

3.  Finally, Fisher expresses (at 48) incredulity that UT permits applicants to self-identify their race, exclaiming that UT "does not even have a means of verifying whether a student falls into one particular racial category or another." But self-identification is used by institutions of higher education throughout the nation (and was used by the admissions process approved in *Grutter*), not to mention on numerous other government forms, like the census. UT requires its applicants to certify that all information submitted in the admissions process is "factually true and honestly presented." And to UT's knowledge, no one, including Fisher, has argued that UT's applicants are misreporting their race. Nor does Fisher suggest any workable alternative to self-reporting. There is none. This argument, instead, is just an attack on race-conscious programs generally.

### C. Fisher's Challenge To UT's Determination That It Lacked A "Critical Mass" In 2004 Or 2008 Is Outside The Scope Of The Supreme Court's Remand And, In Any Event, Lacks Merit

1. This Court also asked the parties to address several questions concerning "critical mass," including whether "the University [is] due any deference in its decision that 'critical mass' has not been achieved." Briefing Order at 2. The answer to the deference question is yes—a university is entitled to deference on that determination. The determination whether a university has achieved a critical mass is wrapped up in educational judgments about student body diversity, the university's educational objectives and particular circumstances, and the "academic mission" that is of "'special concern of the First Amendment.'" *Fisher*, 133 S. Ct. at 2418 (quoting *Bakke*, 438 U.S. at 312 (op. of Powell, J.)). More fundamentally, the question whether the university already has a critical mass before it adopts a race-conscious plan concerns whether it has any compelling interest in using race to obtain student body diversity in the first place. And the Supreme Court reiterated in *Fisher* that a university *is* entitled to deference on the compelling-interest side of the strict scrutiny analysis. *Id.* at 2419.

In *Fisher*, the Court clarified that universities are not owed deference with respect to the *means* used in implementing race-conscious measures. But the Court did not question *Bakke*'s teaching that universities *are* owed some deference to their assessment of whether their educational missions are—or are not—being

fulfilled. The Supreme Court's opinion in no way casts doubt on this Court's prior decision rejecting Fisher's argument that "minority enrollment already met or exceeded 'critical mass' when [UT decided to add race-conscious measures]," such that "any further facial consideration of race was neither warranted nor constitutional." *Fisher*, 631 F.3d at 242; *see id.* at 235 & n.121.

Nor did the Supreme Court disagree with this Court that diversity is not a one-size-fits-all concept, as "[p]reparing students to function as professionals in an increasingly diverse workforce … calls for some consideration of a university's particular educational mission and the community it serves." *Id.* at 236-37. To the contrary, the Court specifically endorsed Justice Powell's view that "[t]he academic mission of a university is a 'special concern of the First Amendment,'" 133 S. Ct. at 2418 (quoting *Bakke*, 438 U.S. at 312 (op. of Powell, J.)), as well as *Grutter*'s holding that "a university's 'educational judgment that such diversity is essential to its educational mission is one to which [the courts] defer." *Id.* at 2419 (quoting *Grutter*) (emphasis added); *see also Parents Involved*, 551 U.S. at 792 ("First Amendment interests give universities particular latitude in defining diversity.") (Kennedy, J., concurring in part and concurring in the judgment).

That raises a more fundamental problem for Fisher: her reargument that UT lacked a critical mass when it adopted the policy at issue concerns whether UT had a compelling interest in adopting race-conscious measures to begin with—and not

the narrow tailoring question of how the plan *is implemented* (accepting that the university *has* a compelling interest in obtaining student body diversity). Fisher knows this: in this Court, she specifically—and correctly—framed her critical mass arguments as *compelling interest* arguments. Fisher Opening Br. 38-48; Fisher Reply Br. 4-5. This Court rejected those arguments, and Supreme Court did not take issue with this Court's compelling interest analysis, in any way. Instead, as discussed, the Supreme Court disagreed with this Court only on the deference that it gave in the *narrow tailoring* inquiry and the Supreme Court remanded specifically for reconsideration of the *narrow tailoring* analysis. *Supra* at 21-25.

2. In any event, Fisher's "critical mass" argument—like her narrow tailoring argument—should be rejected by this Court again. The record amply supports this Court's conclusion that UT had not yet achieved its diversity objective when it adopted the policy (or denied Fisher's application for admission).

UT based its critical mass determination on several data points, including hard data on minority admissions, enrollment, and racial isolation at UT, as well as discussions with students about their own experiences at UT and faculty observations. S. Ct. JA 431a-32a. In 2003, after several years of facially race-neutral efforts to promote diversity, African-American enrollment fell to a startlingly low number—a mere 3% of the entering class. S. Ct. JA 121a. The figures were only slightly better in 2004—and at best stagnant compared to the

pre-Top 10% plan years.  S. Ct. JA 127a.  In addition, the odds of admission for an

African-American or Hispanic applicant in the second decile of his or her high

school class dropped significantly under the Top 10% law, whereas the odds for a

similarly situated Caucasian applicant increased.  *Fisher*, 631 F.3d at 224.

At the same time, there was jarring evidence of racial isolation at UT.  The

classroom diversity study conducted by UT demonstrated that African-American

and Hispanic students were nearly non-existent in *thousands* of classes.  *Fisher*,

645 F. Supp. 2d at 607.  Although UT has never pursued classroom diversity as a

discrete interest or endpoint (as Fisher suggests), this palpable lack of diversity in

the classrooms—one of many factors UT considered—underscored that UT had

not yet fully realized the educational benefits of diversity.  After all, the classroom

is a principal place where students on any large campus like UT interact with other

students of different backgrounds and stand to benefit from the different

perspectives they have.  UT also concluded that it had not fully addressed racial

isolation, made sufficient progress toward breaking down pernicious stereotypes,

fostered cross-racial communication and understanding on campus, and prepared

its students for the challenges of leading an increasingly diverse workforce.

In attacking UT's critical mass determination, Fisher relies heavily on two

erroneous premises.  First, she maintains (at 24-25) that UT was somehow locked

into the diversity that existed in 1996—the last year of the race-conscious plan

evaluated in *Hopwood*. But there is no basis for concluding that the level of student body diversity in 1996 was a fully realized endpoint, and this argument rests on the discredited assumption that diversity should be measured simply in the "specific percentages" of underrepresented minorities on campus. *Supra* at 22.

Second, Fisher maintains (at 22-24)—as she has throughout this case—that the determination whether a university has attained a critical mass should be based on aggregating distinct groups of students from disparate ethnic and racial backgrounds into an undifferentiated mass of "minority" students. But that argument—soundly rejected by this Court before, *Fisher*, 631 F.3d at 245—not only doubles down on the false premise that the educational benefits of diversity can be measured exclusively by percentages. The argument depends on the "limited notion of diversity," *Parents Involved*, 551 U.S. at 723—denounced by the Supreme Court—that simply lumps together individuals of different races and "fails[] to account for the differences between people of the same race," *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 434 (2006).

Fisher also attacks UT's interest in fostering diversity within diversity. Fisher first mischaracterizes UT's objective and impugns its motives by accusing UT (at 47) of seeking to "promote affluence instead of race." That is preposterous. Not only is Fisher's argument belied by UT's efforts to recruit students—of all races—from *disadvantaged* socio-economic backgrounds, S. Ct. JA 112a-13a,

147a, 148a, but she misses the point altogether.  Ensuring a diversity of backgrounds—within racial groups—is one of the best ways to help breakdown racial stereotypes and promote cross-racial understanding, and often students who come from integrated environments are particularly successful in bridging racial barriers.  This is not news.  The Harvard plan commended by the Supreme Court in *Bakke* itself recognized this added dimension of diversity.  *Bakke*, 438 U.S. at 323-24; *see also* Elise Boddie, *Commentary on* Fisher: *The importance of diversity within diversity*, SCOTUSBlog (Oct. 11, 2012), http://www.scotusblog.com/2012/10/commentary-on-fisher-the-importance-of-diversity-within-diversity/.  The point is not to favor applicants from any one background—it is to promote diversity by admitting students—of all races—from all *different* backgrounds.

    3.   This Court has also asked the parties to address when UT is "likely to" achieve "critical mass," assuming the plan at issue remains in place.  Briefing Order at 2.  Consistent with its 2004 Proposal, UT reviews its plan on an annual basis with this in mind.  That review process takes account of various data points, including but not limited to enrollment figures; evidence of racial isolation and the racial climate on campus (which includes reports of racially hostile or insensitive conduct), including feedback from faculty and students; and other data including the educational benefits of diversity experienced in the classroom.  UT will cease its consideration of race when it determines, based on such considerations, that the

educational benefits of diversity can be achieved at UT through a race-neutral policy "at reasonable cost" to its other educational objectives.  SJA 22a.

Certainly the student body diversity has improved at UT since the plan was adopted—that was the objective of the plan, and that improvement just shows that it is working.  And UT is proud of the fact that it has one of the more diverse campuses in the country.  But no one seriously suggests that the problem in higher education is that there is *too* much diversity on college campuses, or that progress cannot be made.  UT S. Ct. Br. 42.  Even Fisher has never argued that UT has achieved a critical mass of African-American students—a group that fared especially poorly when race-conscious admissions ended after *Hopwood*.  Instead, her critical mass argument focuses on lumping minority groups together and dismissing any qualitative or academic dimension to this determination.  And while steady progress has been made for Hispanic students at UT, Fisher is wrong (for the reasons discussed) that percentages tell the whole story.  UT S. Ct. Br. 45.

Of course, none of this has changed since the first appeal.  Nor did the Supreme Court in any way change the law—including *Grutter*—on what constitutes a critical mass or when a university may conclude that a critical mass is lacking.  Nor did the Supreme Court question this Court's critical mass determination.  Instead, it asked this Court to reconsider whether UT's policy is narrowly tailored in its implementation.  It is, for the reasons explained.

## III.   THIS COURT HAS DISCRETION TO REMAND THE CASE TO THE DISTRICT COURT IF IT CHOOSES TO DO SO

In answer to this Court's questions concerning a remand to the District Court (Briefing Order at 1), this Court has discretion to remand the case to the District Court.  It would be entirely appropriate to exercise that discretion here, for the reasons already elaborated on by UT in its Statement Concerning Further Proceedings on Remand and related briefs.  Indeed, it is commonplace for appellate courts to carry out a Supreme Court "remand[] for further proceedings consistent with this opinion" by sending the case back to the district court.  *See, e.g.*, *Spector v. Norwegian Cruise Line, Ltd.*, 427 F.3d 285, 286 (5th Cir. 2005); *FW/PBS, Inc. v. City of Dallas*, 896 F.2d 864, 865 (5th Cir. 1990).  The Supreme Court's remand order does not divest the Court of that discretion.  If the Court chooses to exercise it, it should instruct the District Court to conduct the narrow-tailoring analysis called for by the Supreme Court's decision and/or to consider any threshold issues and whether further factual development is warranted.

Relying on the Court's statement that "[w]hether this record … is sufficient is a question for the Court of Appeals in the first instance," *Fisher*, 133 S. Ct. at 2421, Fisher implausibly argues (at 4) that the Supreme Court's decision "clear[ly] and unequivocal[ly]" bars this Court from remanding the case to the District Court—for any reason.  As UT has explained, however, when read (as it must be) in context of the entire paragraph in which that sentence appears, the Supreme

Court's mandate does not foreclose a remand to the District Court. Statement Concerning Further Proceedings on Remand 3-6; Reply Concerning Further Proceedings on Remand 1-4; Motion to Strike Sur-Reply 2-4.

In context, this reference simply conveys the Supreme Court's conclusion that it was not prudent for *it* (*i.e.*, the Supreme Court) to plunge ahead and undertake the record-intensive inquiry it called for. The Court did not, as Fisher insists, forbid this Court to remand the case back to the District Court—to *aid* the Court in undertaking that inquiry. *Cf. United States v. Williamson*, 47 F.3d 90 (11th Cir. 1995) (remanding case to the District Court following Supreme Court's remand "to the Court of Appeals to conduct this inquiry in the first instance"). And even if the Supreme Court's mandate did require this Court—and this Court only—to consider the narrow-tailoring issue *first*, surely it would not prohibit the Court from considering the issue (as briefed by the parties here) and *then* deciding that a remand was necessary or appropriate.

Fisher argues (at 6) that a remand is inappropriate because the parties have argued that there are "no disputed facts" foreclosing summary judgment. But UT has not maintained that the existing factual record is now disputed (although the parties of course disagree over the legal import of facts). Instead, UT simply maintains that, to the extent that this Court were to conclude (despite the arguments herein) that the Supreme Court *has* altered or clarified the narrow-

tailoring analysis under *Grutter* in a way that prevents this Court from granting judgment for UT on the existing record, then UT should be afforded an opportunity to present *additional* evidence in response to the new standard. "Fairness to the litigants" invariably mandates such an opportunity. *See, e.g.*, *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 282 (5th Cir. 1999) ("When law changes in unanticipated ways during an appeal … this court will generally remand for a new trial to give parties the benefit of the new law and the opportunity to present evidence relevant to that new standard."). Moreover, although Fisher proceeds as though this case *must* be resolved on summary judgment one way or the other, a denial of summary judgment to UT does not compel a grant of summary judgment *to Fisher*. *Cf. Fisher,* 133 S. Ct. at 2421 (noting that *Grutter* "was decided after trial," whereas in this case the question is whether "summary judgment *in favor of the University*" is appropriate) (emphasis added).[8]

Finally, Fisher urges this Court (at 9) to issue a decision "as expeditiously as possible." To that end, Fisher impractically suggests (at 10) that, if this Court does remand the case, it should instruct the District Court "to issue its decision on constitutional liability within 45 days"—granting the District Court substantially less time *to decide the case* than the parties had to brief it on this Court's expedited

---

[8]  Fisher claims (at 7-8), that a remand would give UT "two bites at the apple." But the cases she cites involved lengthy *trials* (not an appeal following a summary judgment motion) and did not involve remands from the Supreme Court in which the Court had asked the lower courts to reconsider an issue.

schedule. But the significance of the constitutional questions presented call for the courts to proceed cautiously and prudently with this case, not with the abandon Fisher proposes. Fisher may wish to go back to the Supreme Court and challenge its precedent again, but her sole remaining damages claim (for $100) is hardly a basis for emergency measures. And there is no reason for this Court to rush its deliberation of this case, or short circuit a remand that the Court concludes would be helpful or necessary in resolving the remaining issue.

\* \* \* \* \*

Thirty-five years ago Justice Powell observed that nothing less than "the 'nation's future depends upon leaders trained through wide exposure' to ideas and mores of students as diverse as this Nation of many peoples." *Bakke*, 438 U.S. at 313 (citation omitted). The Supreme Court reaffirmed the vital importance of that objective in *Grutter,* 539 U.S. at 332—a decision that the Supreme Court "accept[ed] as given" in this case. UT—the State of Texas's flagship public educational institution—has wholeheartedly embraced that objective. For more than seven years (from 1997 to 2004), it tried to realize the educational benefits of diversity through race-neutral means, including the Top 10% law. But at best, UT was simply treading water, and several factors indicated that it was losing ground. The race-conscious plan it adopted not only was carefully modeled on the plans commended by the Supreme Court in *Grutter* and *Bakke*, but the record shows that

the plan is narrowly tailored to advance UT's educational objectives.  Scrutinizing

the record—without deference to UT—does not change that conclusion.

## CONCLUSION

This Court should dismiss this case for lack of standing, affirm the judgment

of the District Court granting summary judgment to UT, or remand to the District

Court for further proceedings consistent with its decision.

Respectfully submitted,

/s/  Gregory G. Garre

| | |
|---|---|
| | Gregory G. Garre* |
| Patricia C. Ohlendorf | *Counsel of Record* |
| Vice President for Legal Affairs | Maureen E. Mahoney |
| THE UNIVERSITY OF | Lori Alvino McGill |
|    TEXAS AT AUSTIN | LATHAM & WATKINS LLP |
| Flawn Academic Center | 555 11th Street, NW, Suite 1000 |
| 2304 Whitis Avenue | Washington, DC 20004 |
| Stop G4800 | gregory.garre@lw.com |
| Austin, TX 78712 | Tel:  202-637-2200 |
| | Fax: 202-637-2201 |
| | |
| Douglas Laycock | James C. Ho |
| UNIVERSITY OF VIRGINIA | GIBSON, DUNN & CRUTCHER LLP |
|    SCHOOL OF LAW | 2100 McKinney Avenue |
| 580 Massie Road | Suite 1110 |
| Charlottesville, VA 22903 | Dallas, TX 75201-6912 |

*Attorneys for Appellees*

Dated:  October 25, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October, 2013, I caused a true and correct copy of the foregoing to be filed electronically with the Clerk of the Court via the ECF system and transmitted to counsel registered to receive electronic service.  I also caused true and correct copies of the foregoing to be delivered via FedEx next business day delivery and email to the following counsel of record not registered to receive electronic service:

Vincent Adrian Eng
Asian American Justice Center
Suite 1200
1140 Connecticut Avenue, NW
Washington, DC 20036
veng@advancingequality.org

Lawrence J Fox
Drinker, Biddle & Reath, L.L.P.
Suite 2000
1 Logan Square
Philadelphia, PA 19103-6996
lawrence.fox@dbr.com


/s/ Gregory G. Garre
Gregory G. Garre

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies the following:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,445 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in Microsoft Word 2010 using 14-point Times New Roman font in the text and footnotes.

Executed October 25, 2013.

s/ Gregory G. Garre
Gregory G. Garre